IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **MEGHAN SHIGO,** | |
| **Plaintiff,** | |
| v. | Case No. 21-2079-DDC |
| **JANCY G. CLARK,** | |
| **Defendant.** | |

### MEMORANDUM AND ORDER

This case is about a horse sale gone wrong. Plaintiff Meghan Shigo, a California resident, purchased a "once in a lifetime horse" from defendant Jancy Clark, a Kansas resident. Plaintiff planned to use the horse for ranch riding activities and competitions. But, within days of receiving the horse—named "Ace"—plaintiff realized something wasn't right. Ace began tripping and, as time went on, had enough trouble walking that no one could ride him. Turns out, Ace has Navicular disease, resulting in lameness. In response, plaintiff brought this lawsuit against defendant, who appears pro se.[1]

Invoking the court's diversity jurisdiction,[2] and arguing that defendant knew about Ace's pre-existing health condition, plaintiff asserts claims for deceptive and unconscionable acts and

---

[1] Because defendant appears pro se, the court ordinarily would construe her filings liberally and hold them "to a less stringent standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But, because defendant failed to respond to plaintiff's summary judgment motion, there's no filing to construe—liberally or otherwise. Nevertheless, the court still draws all inferences in defendant's favor because she's the party opposing summary judgment. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

[2] In a previous Memorandum and Order, dated January 13, 2022, the court held that it had diversity jurisdiction under 28 U.S.C. § 1332(a). *See* Doc. 33 at 2 & n.2 (noting complete diversity and that plaintiff adequately had alleged the jurisdictional amount in controversy, *i.e.*, more than $ 75,000).

practices under the Kansas Consumer Protection Act. She also asserts Kansas common law claims for fraud and breach of contract. Plaintiff now moves for summary judgment on all three claims against defendant. *See* Doc. 37. Defendant has failed to respond to the motion, both after the original deadline to do so passed, and after the court issued a Notice and Order to Show cause to defendant, extending the deadline. *See* Doc. 40. The court thus considers plaintiff's request for summary judgment as an unopposed motion. But, nevertheless, it grants the motion only in part. The court explains this ruling, below.

**I.     Background**

The following facts either are stipulated in the Pretrial Order (Doc. 36), uncontroverted, or, where controverted, presented in the light most favorable to defendant, the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Plaintiff Meghan Shigo wanted to buy a high-quality horse for personal and recreational use. Doc. 38-5 at 1 (Shigo Decl. ¶ 3). She also wanted the horse to compete in ranch competition activities. *Id.* In December 2020, she found the horse she was looking for—Ace, a "once in a lifetime horse" and an "easy keep, sound and sane[,]" according to the seller, defendant Jancy Clark. Doc. 36 at 2 (Pretrial Order ¶ 2.a.2.) (internal quotations omitted). Premier Horse Sales[3] and defendant advertised Ace as both "capable and perfect for ranch riding activities." *Id.* (Pretrial Order ¶ 2.a.1.). Premier Horse Sales also "specifically warranted and guaranteed potential buyers and consumers that 'All horses [that] sell with a pre-purchase exam are guaranteed sound and guaranteed to be exactly as consignors represent them to be.'" *Id.*

---

[3]     Premier Horse Sales' corporate name is MM Auction Services, LLC. *See* Doc. 5. The Pretrial Order refers to MM Auction Services, LLC and Premier Horse sales interchangeably. *See* Doc. 36 at 2 (Pretrial Order ¶¶ 2.a.1.–2.a.4.).

2

(Pretrial Order ¶ 2.a.3.).  So, around December 5, 2020, plaintiff purchased Ace for $33,115.00.  *Id.* (Pretrial Order ¶ 2.a.4.).

Two days later, Ace arrived at plaintiff's boarding facility.  *Id.* (Pretrial Order ¶ 2.a.5.).  For the next ten days or so, plaintiff rode Ace on trails and in a round pen.  *Id.* (Pretrial Order ¶ 2.a.6.).  But, Ace tripped frequently and seemed sore.  *Id.* (Pretrial Order ¶ 2.a.7.).  In response, plaintiff asked defendant for Ace's pre-sale x-rays—from November 2020—which defendant provided.  *Id.* (Pretrial Order ¶ 2.a.8.).  Plaintiff showed those x-rays to her veterinarian, Dr. David Treser, on December 22, 2020.  Doc. 36 at 2 (Pretrial Order ¶ 2.a.9.); Doc. 38-4 at 2 (Treser Decl. ¶¶ 8, 10).  Dr. Treser performed more x-rays at that time and compared them with the November 2020 x-rays.  Doc. 38-4 at 4 (Treser Decl. ¶ 29).  Turns out, Dr. Treser observed, "Ace suffered from Navicular syndrome."  Doc. 36 at 2 (Pretrial Order ¶ 2.a.9.); Doc. 38-4 at 2 (Treser Decl. ¶ 11).  In Dr. Treser's words, "Navicular syndrome . . . is a syndrome of lameness problems in horses.  It commonly describes an inflammation or degeneration of the navicular bone . . . usually on the front feet.  It can lead to significant and even disabling lameness, or an abnormal stance or gait[.]"  Doc. 38-4 at 3 (Treser Decl. ¶ 16).  In Dr. Treser's opinion, Ace had Navicular syndrome before the December 5, 2020 auction, "at the time of the auction[,] and upon delivery to [plaintiff] in California."  *Id.* at 2 (Treser Decl. ¶¶ 11, 13).  And, Dr. Treser also opined, Ace's condition hadn't improved since then.  *See id.* at 4 (Teser Decl. ¶¶ 29–31).

Indeed, Ace's medical records from the three and a half years before the sale (April 2017) showed that Ace "had presented with a history of intermittent lameness in the right fore hoof."  Doc. 38-3 at 1 (Turchi Decl.).  Defendant's veterinarian, Dr. Paul Turchi, had informed defendant about Ace's "history" of "intermittent lameness" as early as April 24, 2017.  *Id.*  From that point forward, the record mostly is silent about Ace's condition in the three and a half years

3

after Dr. Turchi noted Ace's history of intermittent lameness.  But, in June 2020, Ace underwent a "brief lameness exam" where he "was examined in motion with hoof testers[.]" *Id.*  According to Dr. Turchi, "no lameness was observed" at that time. *Id.*  A few months later, in November 2020, Dr. Turchi examined and x-rayed Ace again, in preparation for the auction. *Id.*  From that exam, Dr. Turchi "found Ace had some changes in his right front navicular bone." *Id.*  Dr. Turchi told defendant about these changes. *Id.*  Dr. Turchi also prescribed OsPhos for Ace's "long term health[.]" *Id.*  OsPhos is a prescription drug "frequently used to treat and slow the progression of Navicular Disease Syndrome[.]" Doc. 38-4 at 3 (Treser Decl. ¶ 19).

After she learned of Ace's condition, plaintiff sought treatment from Dr. Treser.  Dr. Treser and plaintiff agreed to install new horseshoes on Ace, and to continue treating his Navicular syndrome with OsPhos and to prescribe Equioxx, a painkiller.  Doc. 36 at 2–3 (Pretrial Order ¶¶ 2.a.11–12.).  This treatment helped Ace for a few weeks. *Id.* at 3 (Pretrial Order ¶ 2.a.12.).  But, treatment can only alleviate Navicular syndrome; it can't eradicate it. *Id.* (Pretrial Order ¶ 2.a.13.); *see also* Doc. 38-4 at 3 (Treser Decl. ¶¶ 20–21).  By February 2021, three people at Ace's barn had approached plaintiff "with their concerns for Ace's health and condition."  Doc. 36 at 3 (Pretrial Order ¶ 2.a.12.); *see also* Doc. 38-5 at 2 (Shigo Decl. ¶ 16).  In Dr. Treser's view, "Ace's condition will only worsen" and his "long term prognosis for a return to soundness is guarded to poor." Doc. 38-4 at 3, 4 (Treser Decl. ¶¶ 22, 26).

In February 2021, plaintiff sent a text message to defendant about Ace.  Doc. 36 at 3 (Pretrial Order ¶ 2.a.18.).  Defendant told plaintiff Ace wasn't lame before the sale. *Id.* (Pretrial Order ¶ 2.a.19.).  Defendant conceded that Ace had tripped frequently before the sale. *Id.*  But, she added, Ace was fine after she changed his shoes. *Id.*  Defendant also conceded that Ace's prior x-rays showed "some Irregularities but as long as he was sound no concern." *Id.* (Pretrial

4

Order ¶ 2.a.20.) (internal quotations omitted). Defendant told plaintiff she "would send [plaintiff's] money back in a minute if [she] had it." *Id.* (Pretrial Order ¶ 2.a.21.). But, defendant said, she sold Ace "because [she] needed to get [her] place paid off before [she had] to stop riding . . . . .So so sorry." *Id.* Defendant then offered to pay for anything Ace needed. *Id.* (Pretrial Order ¶ 2.a.22.). She also permitted plaintiff to contact Dr. Turchi personally. *Id.* (Pretrial Order ¶ 2.a.23.).

Plaintiff called Dr. Turchi to discuss Ace's condition before the sale. *Id.* at 3–4 (Pretrial Order ¶ 2.a.24.). Dr. Turchi told plaintiff that, after he examined and x-rayed Ace on November 11, 2020, he had told defendant about "abnormalities in the navicular" and that "Ace's front heels were too low[.]" *Id.* He suggested x-rays from another angle, but defendant declined. *Id.* In defendant's view, those x-rays views weren't necessary for Ace's upcoming marketing and sale. *Id.*

Around the same time, plaintiff also talked to Premier Horse Sales' owner Colby Gines. Mr. Gines told plaintiff his company didn't have time to review every horse it auctioned, and that his company didn't research Ace specifically. *Id.* at 3 (Pretrial Order ¶¶ 2.a.15–17.) Later, he told plaintiff that he could do "absolutely nothing" about Ace's sale and that he and his company "do our best to try to keep this stuff from happening" but that "1 horse out of 68 isn't bad." *Id.* at 4 (Pretrial Order ¶ 2.a.26.) (internal quotations omitted). Mr. Gines also told plaintiff he had learned that defendant was going to return plaintiff's money and take Ace back. *Id.* at 4 (Pretrial Order ¶ 2.a.25.). But, the record suggests, this refund never materialized.

Because of Ace's condition, plaintiff can't use him as she intended. Doc. 38-4 at 3, 4 (Treser Decl. ¶¶ 23, 30). In Dr. Treser's opinion, Ace's condition only will worsen, especially if anyone continues to ride him. *Id.* at 3, 4 (Treser Decl. ¶¶ 22, 25). Ace will require continued

ongoing medical care, treatment, and maintenance of his degenerative condition. *Id.* at 4 (Treser Decl. ¶ 31). Plaintiff wouldn't have purchased Ace if she had learned of his true condition and Navicular syndrome before the sale. Doc. 38-5 at 4 (Shigo Decl. ¶ 30). The parties stipulate that plaintiff purchased Ace for $ 33,115.00. Doc. 36 at 2 (Pretrial Order ¶ 2.a.4.). After combining this stipulated purchase price with the costs of Ace's transportation to California, his medical treatment, and his boarding, plaintiff declared that she has incurred $53,982.00 in damages. Doc. 38-5 at 4–5 (Shigo Decl. ¶ 31) (detailing plaintiff's damages calculations).[4]

## II.     Legal Standard

Summary judgment is appropriate when the moving party demonstrates "no genuine dispute" about "any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the court applies this standard, it views the evidence and draws reasonable inferences in the light most favorable to the non-moving party. *Scott*, 550 U.S. at 378. But the court "need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it." *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1173 (10th Cir. 2017). An issue of "material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[4]     Importantly, the damages that plaintiff ultimately proves for summary judgment purposes doesn't undermine the court's subject matter jurisdiction. *See Frederick v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1245 (10th Cir. 2012) (explaining that jurisdictional amount in controversy "is not the amount the plaintiff will recover, but rather an estimate of the amount that will be put at issue in the course of the litigation" (quotation cleaned up)); *see also Gibson v. Jeffers*, 478 F.2d 216, 220 (10th Cir. 1973) ("The test to determine amount in controversy is not the sum ultimately found to be due, but the sum demanded in good faith."). And, when assessing whether plaintiff sufficiently has alleged the amount in controversy, the court counts all of plaintiff's alleged damages, including punitive damages and statutorily permitted attorney's fees. *See Woodmen of World Life Ins. Soc'y v. Manganaro*, 342 F.3d 1213, 1218 (10th Cir. 2003). As the court previously concluded, plaintiff sufficiently alleged more than $75,000 in damages. Doc. 33 at 2.

(1986). And, an issue of fact is "material" if it can "affect the outcome of the suit under the governing law[.]" *Id.* The party moving for summary judgment bears the initial burden of showing "the basis for its motion[.]" *Celotex Corp.*, 477 U.S. at 323.

Here, plaintiff's summary judgment motion is unopposed. On February 1, 2022, plaintiff filed a Motion for Summary Judgment. Doc. 37. The same day, plaintiff also served on defendant a Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment, as our court's local rules require. Doc. 39. The notice informed defendant that if she did "not respond to the motion for summary judgment on time with affidavits and/or documents contradicting the material facts asserted by the plaintiff, the court may accept plaintiff's facts as true, in which event judgment may enter[ ] in plaintiff's favor and against [defendant] without a trial." *Id.* at 2. Under D. Kan. Rules 6.1(d)(2) and 7.1(c), defendant was required to respond to plaintiff's motion within 21 days, or by February 22, 2022. Several weeks after that deadline passed, the court issued a Notice and Order to Show Cause to defendant, directing her to respond to plaintiff's motion by May 2, 2022. Doc. 40. That second deadline for defendant to respond has passed now as well. Thus, defendant has failed to file any response to plaintiff's summary judgment motion.

Under D. Kan. Rule 7.4(b), a party "who fails to file a responsive brief or memorandum within the time specified in D. Kan. Rule 6.1(d) waives the right to later file such brief or memorandum" unless there is "a showing of excusable neglect[.]" Because defendant hasn't responded to plaintiff's summary judgment motion or otherwise shown excusable neglect, the court "consider[s] and decide[s] the motion as an uncontested motion." D. Kan. Rule 7.4(b). But defendant's failure to respond to plaintiff's summary judgment motion—alone—is not a sufficient basis to grant summary judgment to plaintiff. *See Reed v. Bennett*, 312 F.3d 1190,

1195 (10th Cir. 2002). Instead, the court still must determine whether judgment for the moving party is appropriate under Fed. R. Civ. P. 56. *Id.* Nevertheless, failing to respond to a summary judgment motion "waives the right to respond or to controvert the facts asserted in the summary judgment motion" and requires the court to "accept as true all material facts asserted and properly supported in the summary judgment motion." *Id.*

### III.     Analysis

Plaintiff asserts three claims against defendant: (1) deceptive and unconscionable acts and practices, violating the Kansas Consumer Protection Act (KCPA), Kan. Stat. Ann. §§ 50-626, 50-627 (Count One); (2) common law fraud (Count Two); and (3) breach of contract (Count Three). Doc. 36 at 8–9 (Pretrial Order ¶ 4.a.). Plaintiff has adduced evidence sufficient to carry her summary judgment burden on Counts One and Three—but not count Two. The court addresses each claim, below.

#### A.     KCPA Claims

Kansas adopted the KCPA "to protect consumers from suppliers who commit deceptive and unconscionable practices[,]" among other things. Kan. Stat. Ann. § 50-623(b). To that end, the KCPA prohibits "supplier[s]" from engaging in "any deceptive act or practice in connection with a consumer transaction." *Id.* § 50-626(a). It also prohibits suppliers from engaging "in any unconscionable act or practice in connection with a consumer transaction." *Id.* § 50-627(a).

Plaintiff has demonstrated that defendant's sale of Ace falls within the KCPA's ambit. Plaintiff is a consumer—"an individual . . . who [sought] or acquire[d] property or services for personal, family, household, business or agricultural purposes." *Id.* § 50-624(b). She sought to purchase Ace for her own recreational use and for competitive purposes. Defendant is a supplier—a "seller . . . or other person who, in the ordinary course of business, solicit[ed],

8

engage[d] in or enforce[d] consumer transactions, whether or not dealing directly with the consumer." *Id.* § 50-624(l). Defendant advertised and sold Ace to plaintiff through an auctioneer. And, finally, the sale of Ace from defendant to plaintiff was a consumer transaction, *i.e.*, a "sale . . . for value of property or services within [Kansas.]" *Id.* § 50-624(c). Plaintiff asserts that defendant committed several deceptive acts and practices, as well as unconscionable acts and practices when she sold Ace to plaintiff through a Kansas auction. The court first addresses plaintiff's evidence of deceptive acts. Then, it addresses her evidence of unconscionable acts.

### 1. Deceptive Acts

Ordinarily, "whether a deceptive act or practice has occurred under the Kansas Consumer Protection Act is not a question of law for the court, but rather a question of fact for a jury to decide." *Manley v. Wichita Bus. Coll.*, 701 P.2d 893, 897 (Kan. 1985). But, such a claim "is susceptible to summary judgment in a defendant's favor only if unsupported by evidence." *Via Christi Reg'l Med. Ctr., Inc. v. Reed*, 314 P.3d 852, 864 (Kan. 2013). Conversely, a court may grant summary judgment to a moving plaintiff if she adduces evidence sufficient for a reasonable jury to find a deceptive act or practice and there's no genuine dispute of material fact. *See id.* Plaintiff asserts that defendant committed four deceptive acts. But the court concludes plaintiff has shouldered her summary judgment burden for just two of them.

Plaintiff has adduced evidence that defendant (1) knowingly represented that Ace had characteristics, uses, or benefits that Ace didn't have, violating Kan. Stat. Ann. § 50-626(b)(1)(A); and (2) knowingly represented that Ace was of a particular standard, quality, or grade that materially differed from reality, violating Kan. Stat. Ann. § 50-626(b)(1)(D). Defendant advertised Ace as an "easy keep, sound and sane[.]" Doc. 36 at 2 (Pretrial Order ¶

9

2.a.2.) (internal quotations omitted).  And, she specifically marketed Ace as both "capable and perfect for ranch riding activities."  *Id.* (Pretrial Order ¶ 2.a.1.).  But, plaintiff has adduced evidence that Ace suffered Navicular syndrome before the sale, that he was tripping and having trouble walking, and, most importantly, that defendant knew about it.  Plaintiff also has adduced evidence that defendant knew about Ace's history of intermittent lameness as early as April 2017—more than three and a half years before the sale.  Thus, plaintiff has mustered sufficient evidence for a reasonable jury to find that (1) defendant knowingly represented Ace to have uses and benefits that he didn't have, and (2) defendant knowingly represented that Ace was of a particular standard that differed from reality.  And, the summary judgment record doesn't reveal any genuine issue of material fact about the evidence plaintiff has adduced.  So, plaintiff is entitled to summary judgment for her claims that defendant violated Kan. Stat. Ann. §§ 50-626(b)(1)(A) and (b)(1)(D).

The story's different, however, for plaintiff's two alleged deceptive acts under Kan. Stat. Ann. §§ 50-626(b)(2) and (b)(3).  That's because those two subsections prohibit *willfully* deceptive acts.  And willfully deceptive acts require more proof than knowingly deceptive acts.  *See Via Christi Reg'l Med. Ctr., Inc.*, 314 P.3d at 865 (explaining that "the 'knowingly or with reason to know' standard of [§] 50-626(b)(1) is a more forgiving one from [the consumer's] perspective, when compared with the willfulness standard of [§§] 50-626(b)(2) and (b)(3).").  As our court has explained, for a willful conduct claim, it "is not sufficient to allege that [the supplier] willfully gave information that later" turned out false.  *Tufts v. Newmar Corp.*, 53 F. Supp. 2d 1171, 1179 (D. Kan. 1999).  Rather, to "show willful conduct," plaintiff must adduce some evidence "that would allow a reasonable jury to conclude that [the supplier] had a designed

10

purpose to do wrong—*i.e.*, that [the supplier] intended to give the information even though [the supplier] knew that it was false." *Id.*

Here, plaintiff has failed to shoulder her summary judgment burden that defendant either (1) willfully used an exaggeration, falsehood, innuendo, or ambiguity about a material fact about Ace, violating Kan. Stat. Ann. § 50-626(b)(2); or (2) willfully failed to state a material fact or willfully concealed, suppressed, or omitted a material fact about Ace, violating Kan. Stat. Ann. § 50-626(b)(3). To be sure, there's some evidence in the record to support these claims. Defendant has stipulated that, one month before she sold Ace, Dr. Turchi told her about "abnormalities in [Ace's] navicular" bone but that she declined Dr. Turchi's suggestions to take more x-rays from different angles. Doc. 36 at 3–4 (Pretrial Order ¶ 2.a.24.). Defendant also stipulated that she told plaintiff she sold Ace "because [she] needed to get [her] place paid off before [she had] to stop riding." *Id.* at 3 (Pretrial Order ¶ 2.a.21.) (internal quotations omitted). A reasonable juror might find willful conduct from this evidence. But a reasonable juror also could conclude from more equivocal evidence in the summary judgment record that defendant's conduct wasn't willful. In the Pretrial Order, defendant stipulated that Ace's past x-rays "showed some [i]rregularities but as long as he was sound no concern[.]" *Id.* (Pretrial Order ¶ 2.a.20.) (internal quotations omitted). Defendant also stipulated that while Ace had tripped several times before the sale, he was fine after she changed his shoes. *Id.* (Pretrial Order ¶ 2.a.19.).

The evidence in the summary judgment record thus points in two conceivable directions. A reasonable juror might find that defendant willfully used an exaggeration, falsehood, innuendo, or ambiguity about a material fact about Ace, or willfully failed to state a material fact or willfully concealed, suppressed, or omitted a material fact about Ace. But a reasonable juror

11

also could reach the opposite conclusion: that defendant didn't have "a designed purpose to do wrong—*i.e.*, that [she] intended to give . . . information even though [she] knew that it was false." *Tufts*, 53 F. Supp. 2d at 1179. Thus, summary judgment is inappropriate for plaintiff's claims that defendant engaged in willfully deceptive acts that violated either Kan. Stat. Ann. §§ 50-626(b)(2) or (b)(3).

### 2. Unconscionable Acts

Unlike the fact questions underlying deceptive acts claims, "whether an action is unconscionable under the KCPA is a legal question for the court" that "ultimately depends upon the facts in a given case[.]" *Via Christi Reg'l Med. Ctr., Inc.*, 314 P.3d at 867 (first citing *State ex rel. Stovall v. ConfiMed.com, L.L.C.*, 38 P.3d 707 (Kan. 2002); then citing *State ex rel. Stovall v. DVM Enters., Inc.*, 62 P.3d 653 (Kan. 2003)); *see also* Kan. Stat. Ann. § 50-627(b) ("The unconscionability of an act or practice is a question for the court."). To "a great extent, the [unconscionability] determination is left to the sound discretion of the trial court." *Via Christi Reg'l Med. Ctr., Inc.*, 314 P.3d at 867. But, importantly, an "unconscionable act or practice requires *both* supplier deception *and* unequal bargaining power." *Id.* (emphases added). Here, plaintiff asserts two alleged unconscionable acts. The court addresses them each, below, in turn.

*First*, plaintiff asserts, when she purchased Ace, his sale price grossly exceeded the market price for similar horses, violating Kan. Stat. Ann. § 50-627(b)(2). But plaintiff provides no evidence of other horse sales, or even evidence of the fair market price of horses like Ace. For that simple reason alone, plaintiff can't carry her summary judgment burden on her claim that defendant violated Kan. Stat. Ann. § 50-627(b)(2).

*Second*, plaintiff also asserts that defendant "made a misleading statement of opinion" about Ace and plaintiff relied upon it to her detriment, violating Kan. Stat. Ann. § 50-627(b)(6).

Plaintiff has adduced evidence that defendant's advertisement that Ace was capable and perfect for ranch riding activities was misleading. But the court concludes that statement wasn't unconscionable. Under binding Kansas precedent, an "unconscionable act or practice requires *both* supplier deception *and* unequal bargaining power." *Via Christi Reg'l Med. Ctr., Inc.*, 314 P.3d at 867 (emphases added). So, even assuming that defendant deceived or misled plaintiff, plaintiff has adduced no evidence of unequal bargaining power between her and defendant. The court finds that deficiency determinative. *Cf. DVM Enterprises, Inc.*, 62 P.3d at 659 (affirming summary judgment against plaintiff because unconscionability requires "some element of deceptive bargaining conduct and unequal bargaining power" and "there [was] no evidence in the present case of unequal bargaining power"); *see Via Christi Reg'l Med. Ctr., Inc.*, 314 P.3d at 867 (leaving the unconscionability determination "to the sound discretion of the trial court").

### 3. KCPA Summary

In sum, the court grants summary judgment to plaintiff on Count One, alleging defendant violated the KCPA. Specifically, the court finds plaintiff has shown that defendant committed deceptive acts violating Kan. Stat. Ann. §§ 50-626(b)(1)(A) and (D). Because the KCPA declares "each [enumerated deceptive act or practice] . . . a violation of [the] act," Kan. Stat. Ann. § 50-626(b), plaintiff is entitled to summary judgment that defendant committed two KCPA violations—but only two. To the extent plaintiff seeks summary judgment on her other theories of KCPA violations, the court denies summary judgment.

### B. Common Law Fraud

In Count Two, plaintiff asserts a claim for common law fraud. In Kansas, a common law fraud claim "require[s] proof by clear and convincing evidence" of the following five elements:

> (1) false statements were made as a statement of existing and material fact; (2) the representations were known to be false by the party making them or were recklessly

13

> made without knowledge concerning them; (3) the representations were intentionally made for the purpose of inducing another party to act upon them; (4) the other party reasonably relied and acted upon the representations made; and (5) the other party sustained damage by relying upon them.

*Kelly v. VinZant*, 197 P.3d 803, 808 (Kan. 2008).

The court concludes plaintiff isn't entitled to summary judgment for her common law fraud claim because the summary judgment record contains evidence from which a reasonable juror could draw opposite conclusions on the formulation of the third element—that defendant intentionally misrepresented statements of material fact to induce plaintiff to act upon them. The court already has discussed the evidence about defendant's state of mind in Part III.A.2., which addressed plaintiff's claims that defendant committed willfully deceptive acts under the KCPA. The same analysis applies to plaintiff's common law fraud claim. There's evidence in the record to support plaintiff's theory that defendant knowingly, and maybe even intentionally, misrepresented Ace's condition to induce a sale and pay off her home. But, there's also more equivocal evidence from which a reasonable juror could conclude that defendant merely didn't realize the severity of Ace's condition when she sold him. And, under that view, a reasonable juror could conclude defendant didn't mispresent Ace's condition intentionally to induce the sale—*i.e.*, that she didn't commit fraud. In other words, plaintiff hasn't adduced evidence such that all reasonable jurors would agree that defendant had committed fraud. *See Chism v. Protective Life Ins. Co.*, 234 P.3d 780, 787 (Kan. 2010) (emphasizing "three general principles" that guide court's analysis for fraud claims: "(1) Fraud is never presumed; (2) fraud must be established by clear and convincing evidence; and (3) the existence of fraud is normally a question of fact"). Thus, even though plaintiff's motion is unopposed, the summary judgment record doesn't establish that she's entitled to judgment as a matter of law on her claim for common law fraud.

### C. Breach of Contract

In her third and final count, plaintiff asserts a breach of contract claim. To win summary judgment on this claim, plaintiff must adduce sufficient evidence to show there's no genuine dispute about "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013). Plaintiff has adduced evidence to support each element of her breach of contract claim, and the summary judgment record reveals no genuine disputes of material fact.

The parties stipulate that defendant advertised Ace as capable and perfect for ranch riding activities—"an easy keep, sound and sane." Doc. 36 at 2 (Pretrial Order ¶ 2.a.2.). The parties also stipulate that plaintiff purchased Ace for $33,115.00 from an auctioneer acting on defendant's behalf. *See id.* (Pretrial Order ¶¶ 2.a.1, 2.a.4.). But, when plaintiff received Ace, he began tripping frequently and had difficulty walking. Eventually, plaintiff's veterinarian deemed him unable to participate in ranch riding activities, as plaintiff had intended. Plaintiff thus "receive[d] something substantially less or different than what . . . she bargained for." *First Nat'l Bank of Omaha v. Centennial Park, LLC*, 303 P.3d 705, 713 (Kan. Ct. App. 2013). As a result, defendant materially breached the contract. *See id.* No reasonable juror could conclude otherwise because the summary judgment record permits no genuine disputes of any fact material to the contract claim. For that reason, plaintiff is entitled to summary judgment for her breach of contract claim.

### D. Damages

The KCPA authorizes civil penalties "in a sum set by the court of not more than $10,000 for each violation" of the act against an aggrieved consumer. Kan. Stat. Ann. § 50-636(a). As discussed above, the court grants summary judgment to plaintiff for her claims that defendant violated Kan. Stat. Ann. §§ 50-626(b)(1)(A) and (D)—two separate violations. The court, in its discretion, assesses $ 20,000 in civil penalties against defendant for her two KCPA violations. The court arrives at this amount because the evidence about defendant's violative conduct is so plain and straightforward. Also, the court views it as telling that defendant has elected not to respond to plaintiff's evidence.

Plaintiff's contract damages warrant a bit more analysis. For breach of contract claims, the "burden of proving the damages rests on the plaintiff." *Belot v. Unified Sch. Dist. No. 497, Douglas Cnty.*, 4 P.3d 626, 629 (Kan. Ct. App. 2000). "It is the function of the trier of fact to determine the amount of damages that should be awarded to a party, based upon evidence of the loss suffered." *Id.* Here, plaintiff has declared that her actual damages total $53,982.00. Doc. 38-5 at 4–5 (Shigo Decl. ¶ 31). She's reached that total by combining Ace's purchase price with the costs for veterinarian bills, horseshoes, and boarding. *Id.* But, while the parties stipulate that Ace's purchase price was $33,115.00, plaintiff hasn't provided any documentation or other evidence to support her claim for more than the purchase price. So, on the current summary judgment record, the court concludes that plaintiff has established contract damages as a matter of undisputed fact *only* for Ace's purchase price—$33,115.00. The summary judgment record doesn't provide adequate support for any damages above that amount. At this stage then, plaintiff is entitled to $33,115.00 in damages for her breach of contract claim. She's established both liability and this amount in damages as a matter of undisputed fact. And while the court

16

concludes plaintiff hasn't established that she's entitled to contract damages above that figure, this Order doesn't preclude plaintiff from trying to prove additional contract damages at trial. Instead, plaintiff simply hasn't established entitlement to additional damages as a matter of law.

## IV.  Conclusion

The court grants plaintiff summary judgment for her KCPA claim (Count One), but only for her claims that defendant violated Kan. Stat. Ann. §§ 50-626(b)(1)(A) and (D).  The court also grants plaintiff summary judgment for her breach of contract claim (Count Three).  But, the court denies summary judgment to plaintiff for the balance of her KCPA claims in Count One and her common law fraud claim (Count Two).  As discussed above, plaintiff is entitled to $53,115.00 in total damages—$20,000 in civil penalties plus $33,115 in contract damages—for the claims she's won on summary judgment.

But some claims (and some asserted damages) remain.  The court thus sets a telephone status conference for August 11, 2022, at 3:00 p.m. to determine how plaintiff wants to proceed with her remaining claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Motion for Summary Judgment (Doc. 37) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 27th day of July, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
